TROTTER, EXECUTOR, v. MINNIS.

4-5741                                        136 S. W. 2d 463

Opinion delivered February 5, 1940.

*Ingram & Moher* and *M. F. Elms,* for appellant.

*John W. Moncrief* and *Al G. Meehan,* for appellee.

SMITH, J. This is a suit between the administrators, with the wills annexed, of the estates of Mr. and Mrs. Fletcher Trotter, who were husband and wife, and involves a number of transactions between this married couple. Mr. Trotter owned at the time of his death property worth not less than $66,000, its inventory value, and Mrs. Trotter owned property of much smaller value. They had been married more than fifty years when Mrs. Trotter died July 10, 1936. No child had ever been born to them. There was no testimony to the effect that there had ever been any discord between them; indeed, the testimony is to the contrary, and is to the further effect that Mrs. Trotter, by her frugality and industry, assisted her husband in the accumulation of his estate. Mr. Trotter inherited an estate worth $25,000, but the remainder of his estate was accumulated during his married life. Mr. Trotter became the president of the Standard Grocer Company, a wholesale grocery concern having its place of business in Stuttgart, Arkansas, and was the principal owner of its stock. Fletcher Minnis, a nephew of Mrs. Trotter, was a stockholder and employee of the grocery company, and his father was also a stockholder. Fletcher Minnis' father was the associate of Mr. Trotter in another business operated under the name of Trotter & Minnis, which firm appears to have carried its account with a bank in Clarendon.

The grocer company, of which Mr. Trotter was president, borrowed the sum of $11,000 from the First State Bank of Stuttgart, and this note was indorsed by Trotter, Minnis, Sr., and another stockholder of the grocery company. By payments thereon the note was reduced to $9,000, at which time the bank closed its doors. The note had been acquired by the Reconstruction Finance Corporation, and was sold, along with other assets of the bank, to Mr. T. J. Gay, who was represented in the transaction by J. R. Crowe.

Payment of the note was demanded by Crowe for Gay, and this case finds its inception in the transactions eventuating in its payment. Negotiations for the settlement of this note were conducted between Fletcher Minnis and Crowe. Minnis represented to Crowe, apparently with Trotter's authority, that Trotter could and would pay the note if given some time by borrowing from his (Trotter's) relatives, provided the note was discounted. Crowe agreed to accept $6,200 in payment of the note, and that sum was paid Crowe in full satisfaction of the note.

Mrs. Trotter, at the time, had a comparatively small savings account with the Peoples Bank of Stuttgart, which she carried in her own name. One of the questions of fact which will later be discussed was whether this account was a joint account owned by Mrs. Trotter and her husband, or was owned by her individually.

Trotter had a personal account in excess of $1,000, and the grocer company had its own bank account, the amount thereof not being shown; but these two accounts combined were not sufficient to pay the grocer company note owned by Gay. Trotter began calling in certain loans due him personally, and made deposits at the Peoples Bank until his balance there totaled $3,119. Additional collections subsequently made by Trotter increased his cash assets to $14,509. He deposited $4,000 of this money with a bank in Carrolton, Missouri, operated by a relative of his. When his account reached the sum of $3,119 at the Peoples Bank, Trotter closed the account by checking out his entire balance. Just what

he did with this money and where he kept it is not clear, except that he deposited some cash in a safety box. It is obvious that Trotter was attempting to conceal it. He admitted as much, and explained that he did not want Gay to know that he had this money lest it would be seized under a writ of garnishment and the negotiations for a discount of the Gay note would terminate.

Mrs. Trotter died testate. She named her nephew, Fletcher Minnis, as executor of the will, and devised to him her entire estate. Minnis filed an inventory of the estate, and listed certain shares of corporate stock. The inventory did not include Mrs. Trotter's bank balance. He listed as debts of Mrs. Trotter two notes, one for the sum of $648.67, payable to the order of Mr. Trotter. The other note was for $250, and was payable to the order of Trotter & Minnis. This Minnis, as has been said, was the business associate of Trotter and the father of Fletcher Minnis.

An estrangement between Mr. Trotter and Fletcher Minnis arose over a trivial matter having no relation to their business affairs, which became permanent and acute. On October 16, 1936, three months after the death of his wife, Mr. Trotter filed suit against Minnis for the recovery of the corporate stocks which had been inventoried as the property of Mrs. Trotter, and on March 25, 1937, Minnis filed suit against Trotter for the sum of $5,000 alleged to have been loaned Mr. Trotter by his wife, and for the sum of $431.82 alleged to have been wrongfully withdrawn by Trotter from his wife's bank account after her death.

We return to a consideration of this alleged $5,000 loan. After Fletcher Minnis had obtained a discount of the Gay note, reducing it to $6,200, there was deposited on May 24, 1934, to the credit of Mrs. Trotter's account the sum of $5,000. This deposit consisted of $1,000 in cash and St. Louis exchange to the order of Mr. Trotter for $4,000 drawn by the bank of Carrolton, Missouri, where as has been stated, Mr. Trotter had previously deposited $4,000.

It is not disputed that all of this $5,000 belonged to Mr. Trotter and was his personal money. This deposit was not sufficient to pay the note, but a check had been drawn by Minnis, Sr., against the account of Trotter & Minnis with the Clarendon bank in favor of Mr. Trotter for $1,200, and that check was deposited to the personal account of Mr. Trotter with the Peoples Bank. These two deposits sufficed and were used by Trotter in payment of the Gay note. Trotter personally had no other obligation, and upon paying it, he took a mortgage upon property owned by the grocer company, whose note he had indorsed and paid in the manner stated, to indemnify him for the payment of the note upon which his personal liability was that of an indorser. In paying this note Mr. Trotter used the check of his wife for $5,000 drawn by her in his favor against her account with the Peoples Bank. The insistence is that Trotter, in making the original deposit to his wife's account of the $5,000, as herein stated, gave her that money, and that her check to his order for the same amount constituted a loan thereof to him.

It is conceded that upon making this $5,000 deposit by Mr. Trotter in the name of his wife, a presumption arose that he had given her that money. But that presumption is not conclusive, and may be shown to be untrue. *Kline* v. *Ragland*, 47 Ark. 111, 14 S. W. 474; *Hannaford* v. *Dowdle*, 75 Ark. 127, 86 S. W. 818; *Della* v. *Della*, 98 Ark. 540, 136 S. W. 927; *Johnson* v. *Johnson*, 115 Ark. 416, 171 S. W. 475; *Gilbert* v. *Gilbert*, 180 Ark. 596, 22 S. W. 2d 32; *Wasson* v. *Lillard*, 189 Ark. 546, 74 S. W. 2d 637.

We think the testimony rebuts the presumption of a gift, notwithstanding the fact that three witnesses testified that pending the negotiations for the discount of the Gay note, Mr. Trotter had stated that he would borrow the money from a relative with which to pay the note. These statements must be considered and weighed to determine whether they re-inforce and sustain the presumption that the money had been given to Mrs. Trotter in the first instance.

The testimony leads us to conclude that if these statements were made, they were made for bargaining purposes, and while they must be considered as evidence upon the question of a gift, they did not and do not operate to change the title to the money. These statements may be and are considered to determine whether there had been a gift and a loan, but there are two circumstances which lead us to the conclusion that these statements are not determinative of that question and which circumstances overcome the presumption of a gift.

The first of these is that both Mr. and Mrs. Trotter were present when the deposit was made, and the president of the bank handled the deposit, and while his recollection was not distinct as to what was said by Mr. and Mrs. Trotter at the time, he testified that "There was some discussion as to how to put the money in, but I don't remember what the exact words were." These people were all familiar with making ordinary bank deposits, and if this deposit were merely one for the account of Mrs. Trotter, there was no occasion for any discussion as to how to make it. Trotter explained that the purpose of the deposit was to accumulate and conceal the money with which he proposed to pay the Gay note.

The second circumstance and one which strongly corroborates Mr. Trotter is that on November 11, 1934, Mrs. Trotter signed the following instrument:

"Stuttgart, Ark., Nov. 11th, 1934.
"Pay to the
    "Order of F. Trotter,                    $5,271.76
        "On Bal. Acct. to date
"Fifty Two Hundred Seventy One & 76/100       Dollars
    "and interest at rate of 3% per annum.
"To the First National Bank)
  "81-588     Stuttgart, Ark.)
                        "Mrs. Callie Trotter."

This was not a check on the bank where the deposit was made; in fact, it was written upon the blank check of another bank. But it was for the exact amount of two deposits which Mr. Trotter had made to the account

of his wife, one for $5,000 and the other for $271.16. This was a savings account, which bore interest at the rate of 3 per cent. The genuineness of Mrs. Trotter's signature to this writing is not questioned, and there would appear to be no purpose in its execution except that stated by Mr. Trotter, which was to evidence the fact that he had deposited to his wife's account $5,271.76, which was and continued to be his money, together with the interest which it earned.

Now, this is not a case where a debtor disposed of his property to defeat a creditor and prayed the aid of the courts to secure its return. In such a case the courts would leave him where they found him, and would refuse to lend their aid to undo a fraudulent transaction. Mr. Trotter is not asking aid to secure the return of his money. It has been returned. Nor was there ever any intention to defraud a creditor. The whole purpose of the transaction was to pay the creditor, and the creditor was paid as a result of the transaction. Mr. Trotter was the owner of all the money paid for the Gay note except $1,200 derived from the Trotter & Minnis check for that sum, and he owned one-half of that money. Mr. Trotter had no personal debt except his obligation as an indorser on the note purchased by Gay; and he owned unencumbered property worth not less than $66,000. His method of paying the Gay note was circuitous and artful, but we think this was the purpose of the devious method which he employed, and that he never gave the $5,000 to his wife in the first instance, and did not borrow it from her after having given it to her.

After suit had been brought by Trotter to recover the corporate stock, as above stated, Minnis filed suit, as has also been stated, and the depositions of Trotter and other witnesses were taken. Before the trial of the case Mr. Trotter died April 28, 1938, leaving a will naming appellants as his beneficiaries, and the cause was revived against them.

A decree was entered which contained the finding that Mr. Trotter had given the $5,000 to his wife, and

had later borrowed it from her; but, as appears from what has been said, we do not concur in that finding.

The court also found that Mrs. Trotter's account was not a joint account, and that the balance to her credit at the time of her death was her individual property; and we concur in that finding.

After the death of Mrs. Trotter the bank permitted Mr. Trotter to draw checks against that account totaling $431.82 in payment of the expenses of Mrs. Trotter's last illness and of her burial. Judgment was rendered in favor of Mrs. Trotter's administrator for this amount; and we think properly so. Liability for these expenses was that of the husband, and not that of the wife, and Trotter should have paid them with his own money, and not that of his wife. *Beverly* v. *Nance,* 145 Ark. 589, 224 S. W. 956.

The court also denied recovery of the corporate shares of stock which Minnis had inventoried as belonging to Mrs. Trotter; and we concur in that finding. It is no doubt true that Mr. Trotter had loaned his wife the money with which the shares were purchased, and the notes listed as debts due by Mrs. Trotter evidenced these loans, in part at least, but Minnis testified that Trotter wished to retain certain personal effects belonging to his wife, and that these were given him in payment of the two notes above-mentioned. The court found the fact so to be, and we concur in that finding, and if the notes were thus satisfied, that satisfaction paid for the stock. The transaction appears to have been approved by the probate court.

The net result of the views here expressed is that the decree of the court below is correct in its entirety, except as to the $5,000 deposit, as to which the decree will be reversed.

These estates appear even yet to be in process of administration, and the decree will, therefore, be reversed with directions to discharge Mr. Trotter's estate from liability to Mrs. Trotter's estate on account of this $5,000 deposit. In all other respects the decree is affirmed.